UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re: :
:
JOSEPH DUNN and LINDA A. DUNN,   :   Case No. 05-25370 REF
*Debtors* :

## ORDER

AND NOW, this **10** day of July, 2006, upon my consideration of Debtors' Motion for Sanctions for Violations of Automatic Stay & Expedited Hearing (the "Motion"), which requests sanctions because Easton Auto Exchange, Inc. ("Easton"), knowingly and intentionally violated the automatic stay of Section 362 by first repossessing and then retaining Debtors' 1995 Isuzu Rodeo SUV (the "Rodeo"), and upon my consideration of the testimony and exhibits presented at the hearing before me on July 6, 2006, and upon the authority of 11 U.S.C. §362(k)(1), and upon the discussion in the accompanying Memorandum Opinion issued simultaneously in this matter, IT IS HEREBY ORDERED that the Motion is hereby GRANTED;

IT IS FURTHER ORDERED, reiterating my bench order issued on July 6, 2006, at the hearing in this matter in open court, that Easton shall immediately return possession of the Rodeo to the Debtors by delivering it to their home, if it has not already done so;

IT IS FURTHER ORDERED that Easton shall pay to Debtors, on or before July 21, 2006, the following actual damages in the aggregate amount of $2,775.00, resulting directly from Easton's repossession of the Rodeo in violation of the Section 362 automatic stay:

    1. Debtors' attorneys' fees for eight hours time at the rate of $185 per hour, which is a total of $1,480; plus

    2. Cost for Mrs. Dunn to commute to her place of employment for ten days at $17.36 per day, which is a total of $175.00 (rounded up slightly); plus

3. Loss of wages by Mr. Dunn at his place of employment for ten days and eight hours a day at $14.00 per hour, which is a total of $1,120.

IT IS FURTHER ORDERED that Debtors shall be awarded punitive damages against Easton in the amount of $1,840, $1,000 of which shall be paid in cash on or before July 21, 2006, with the balance of the punitive damages against Easton to be "paid" by expunging all debt, whether principal, interest, costs, or expenses that might otherwise be owed to Easton by Debtors in any respect related to the Rodeo.

IT IS FURTHER ORDERED that this Order shall constitute sufficient record of the expungement of the debt previously owed to Easton by Debtors, but if counsel for Debtors would prefer some formal writing memorializing the expungement of the debt, he may prepare (without reimbursement of his fees by Easton) appropriate documents and submit them to Easton, and Easton shall, if the documents comport with this Order, sign and return such documents to Debtors' counsel.

IT IS FURTHER ORDERED that this grant of actual and punitive damages against Easton is without prejudice to the rights and abilities of Debtors to file and present an appropriate request to the Court to award additional damages that might be incurred by Debtors upon the failure or refusal of Easton to comply with any facet of the payment of damages or in the event that the litigation of this matter continues further.

_____
RICHARD E FEHLING
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re:                                          :
                                                :
JOSEPH DUNN and LINDA A. DUNN,                  :   Case No. 05-25370 REF
        *Debtors*                               :
                                                :

## MEMORANDUM OPINION

This matter arose upon the request of Debtors for an expedited hearing of their Motion for Sanctions for Violations of Automatic Stay & Expedited Hearing (the "Motion") for the alleged violation of the automatic stay of Section 362 of the United States Bankruptcy Code caused when an agent of Easton Auto Exchange, Inc. ("Easton") repossessed Debtors' 1995 Isuzu Rodeo SUV (the "Rodeo"). Easton conducted the repossession during the pendency of this bankruptcy without seeking relief from the automatic stay. Because I find that Easton knowingly and intentionally violated the automatic stay of Section 362, I will grant the Motion and award actual and punitive damages in favor of Debtors and against Easton.

## I. PROCEDURAL BACKGROUND

Debtors initiated their case on September 12, 2005, by filing their petition and accompanying documents seeking relief under Chapter 13 of the Bankruptcy Code. On February 23, 2006, Debtors filed amendments to their Schedules B, C, and D in this bankruptcy case. In amended Schedule B, Debtors listed the Rodeo as their personalty and they claimed it as exempt in amended Schedule C. Debtors also listed Easton as a secured creditor in amended Schedule D. Service of these amended schedules was made upon Easton by mailing them first-class United States mail on February 23, 2006, addressed to Easton at its location at 1845 Freemansburg Avenue, Easton, Pennsylvania. Also on February 23, 2006, Debtors filed an amended claim on behalf of Easton in the amount of $840, which claim was also served on

Easton at the Freemansburg Avenue address by first-class United States mail. On May 22, 2006, Debtors filed, and served on Easton, their fourth amended Chapter 13 Plan, in which Easton would be paid the full amount of the $840 through Debtors' amended plan. Easton filed no objection to the amended claim or to the amended Chapter 13 plan, the latter being confirmed on June 22, 2006.

## FACTS

The present dispute arose on June 14, 2006, when Easton repossessed Debtors' Rodeo. Prior to that date, Easton had received notices of and information about Debtors' bankruptcy through service of certain documents by first-class United States mail. Testifying on behalf of Easton at the hearing on July 6, 2006, Easton's general manager, Aldo R. Guzman, claimed that no one at Easton knew that Debtors were in the midst of a bankruptcy (testimony that I will address below). On either June 14 or June 15, 2006, Debtor, Joseph Dunn, called Easton to ask if the Rodeo had been repossessed;[1] eventually, Easton confirmed it. In the course of his conversations with representatives of Easton, Mr. Dunn informed Easton that if it simply returned the Rodeo, Debtors would demand nothing more.

On June 15, 2006, Debtors' counsel sent to Easton certified mail notice of Debtors' bankruptcy and a request that Easton return the Rodeo. Representatives of Easton refused to accept delivery of the certified letter on June 16, 2006, and June 21, 2006. On June 29, 2006, a representative from the office of Debtors' counsel faxed to Mr. Guzman's attention at Easton notice of Debtors' Motion and a copy of the order scheduling the expedited hearing on July 6, 2006. On July 5, 2006, counsel for Debtor spoke with the owner of Easton, told him about the

---

1. Mr. Dunn thought that the Rodeo might have been either repossessed or stolen.

hearing on July 6, and asked Easton to return the Rodeo. Easton refused, at all times and given all opportunities, to return the Rodeo to Debtors.

## DISCUSSION

Mr. Guzman repeatedly claimed that Easton did not know about Debtors' bankruptcy prior to the repossession of the Rodeo. He acknowledged however, that within a day of the repossession Mr. Dunn had informed him about Debtors' bankruptcy and that Easton should return the Rodeo.

The long-standing protection afforded to debtors by the automatic stay of Section 362, the linchpin of many debtors' "fresh start" and ability to make the bankruptcy process work, has existed for many years. It is inconceivable to me that a business that sells used cars, finances the sales, and repossesses the cars if the loan becomes delinquent can be unaware of the stay. Mr. Guzman, although general manager of Easton for only a couple months, said that he has 20 years in the business. It defies understanding to say that he is or was ignorant of the bankruptcy stay.

Regardless of the ignorance or knowledge about the stay, of course, a creditor simply may not seize property of the estate and is pointedly advised to return property of the estate that was mistakenly seized. The return of the property does not obviate the offense, but rather mitigates the damages that the offending party will incur.

I find that Easton knew about Debtors' bankruptcy at and before the time of the repossession through the various notices mailed to Easton from both the Bankruptcy Court and counsel for Debtors. See Taylor v. Slick (In re Taylor), 207 B.R. 995, 999 (Bankr. W.D. Pa. 1997) (a rebuttable presumption exists that if a notice is properly addressed and mailed, the notice is deemed received and is proper), aff'd on other grounds 178 F.3d 698 (3d Cir. 1999). I

find Mr. Guzman's testimony that Easton had not received anything about the bankruptcy lacks credibility. I find further that, even if Easton might not have known about Debtors' bankruptcy prior to June 14, 2006, Easton learned full well from Mr. Dunn about his bankruptcy on that day or the next. I find also that Easton purposefully refused to accept the June 15 certified letter from Debtors' counsel in a futile effort to bury its head in the sand and feign ignorance. I find that Easton refused to return the Rodeo even after learning that the emergency hearing on this matter had been ordered and scheduled. I find that Easton willfully and intentionally violated the automatic stay by ordering the repossession of the Rodeo on June 14, 2006, and willfully and intentionally violated the automatic stay by steadfastly refusing to return the Rodeo to Debtors when Easton received clear and unqualified notice that Debtors' were in bankruptcy and that Easton had seized the Rodeo in contravention of the Bankruptcy Code.

In In re Jester, No. 05-32185DWS, 2006 WL 1495041, at *5 - 6 (Bankr. E.D. Pa. Apr. 12, 2006), Chief Judge Sigmund recently analyzed what constitutes a willful violation of Section 362. I adopt the reasoning and rationale of Chief Judge Sigmund in the Jester decision, which relied upon the Third Circuit decision in Cuffee v. Atlantic Bus. and Comm. Dev. Corp. (In re Atlantic Bus. and Comm Dev. Corp.), 901 F.2d 325 (3d Cir. 1990). Moreover, "[i]t is well-established that 'knowledge of the bankruptcy filing is the legal equivalent of knowledge of the stay.'" D'Alfonso v. A.R.E.I. Inv. Corp. (In re D'Alfonso), 211 B.R. 508, 517 (Bankr. E.D. Pa. 1997) quoting In re Wagner, 74 B.R. 898, 904 (Bankr. E.D. Pa. 1987).

Easton's conduct is clearly sanctionable under Section 362(k)(1) of the Bankruptcy Code, which provides:

> Except as provided in paragraph (2) [which is not applicable in this case], an individual injured by any willful violation of a stay provided

> by this section shall recover actual damages, including costs and attorneys'
> fees, and, in appropriate circumstances, may recover punitive damages.

11 U.S.C. §362(k)(1). Easton's knowing and intentional violation of the stay makes the imposition of punitive as well as actual damages appropriate; I will address the damages to be awarded below.

## DAMAGES

I find that Debtors suffered three specific types of actual damages caused by Easton's repossession of the Rodeo. First, Debtors have requested payment of their attorneys' fees incurred by Easton's actions in this matter. Debtors' counsel testified that his normal hourly rate is $185 and that he had expended well over eight hours on this matter. In Jester, Chief Judge Sigmund noted that a debtor is entitled to recover attorneys' fees when a creditor willfully violates the stay, but Chief Judge Sigmund was not presented with evidence in the Jester case to establish the amount of the award. Jester, 2006 WL 1560936, at *7. See also In re Meyers, No. 05-18208ELF 2006 WL 1495041, at *5 (Bankr. E.D. Pa. Apr. 6, 2006), in which Judge Frank analyzed a request for attorneys' fees in the context of the creditor's violation of the discharge order. I believe that violation of the discharge order is sufficiently similar to Easton's violation of the automatic stay that I will also rely upon Judge Frank's analysis for guidance. I find that the hourly rate of Debtors' counsel is acceptable and that eight hours is a reasonable amount of time to have (1) communicated with Debtors and Easton, (2) prepared the pleadings, (3) traveled to this Court, and (4) conducted the hearing. I will therefore award against Easton and in favor of Debtors the amount of $1,480 for Debtors' attorneys' fees.[2]

---

2. I realize that Debtors' request for attorneys' fees is limited to $1,000. I note, however, that I have a separate and distinct obligation to protect Debtors who have brought themselves within my jurisdiction and

Second, Debtor, Linda A. Dunn, was obliged to commute to her place of employment for two weeks[3] by taxi, the cost of which was $17.36 per day. Lost wages are an appropriate element of damages, see Meyers, 2006 WL 1560936, at *4, so I believe that the incurrence of a commuting expense to avoid lost wages must be compensable. I will therefore award against Easton and in favor of Debtors the additional amount of $175 (rounded up slightly).

Third, Mr. Dunn was unable to attend his place of employment, at which he was paid $14.00 per hour, without incurring a taxi commuting expense of $40.00 per day for the 28-mile round trip, which he could not afford to pay, so he missed work. Two weeks of his work would have grossed Mr. Dunn $1,120, which amount I will award against Easton and in favor of Debtors.

Missing work led Mr. Dunn's employer to terminate his employment, for which I will not award further damages against Easton because Mr. Dunn could have, somehow, found a way to get to work to avoid being fired. Although I cannot mandate that Mr. Dunn's former employer take him back into its work force, I hope that this Opinion will show them that his inability to get to work during the last half of June was caused by the improper actions of Easton against him. Therefore, the aggregate amount of actual damages that I will award against Easton and in favor of Debtors is $2,275.

---

(cont'd)
to enforce the United States Bankruptcy Code and the process and procedures within its ambit. I therefore exercise my right both to increase the amount of this element of actual damages and to compensate Debtors for actual damages which they did not specifically identify in their Motion (other than a general request for sanctions), but which Debtors established through evidence presented at the hearing held on their Motion on July 6, 2006.

3. Although the time for which Mrs. Dunn may have been obliged to commute via taxi may have exceeded two weeks, I am limiting this element of damages to two weeks (ten days) because Debtors could have come to this Court sooner than June 28, when they filed their Motion herein.

As I turn to the award of punitive damages, I note that they are not always justified by the actions of the offending party. See Jester, 2006 WL 1495941, at *6, n. 10. In this case, however, I find that Easton, in the face of substantial notice of Debtors' bankruptcy, continued its dogged refusal to surrender the repossessed Rodeo. I do accept that Easton's management might not have realized the consequences of what Easton had done and how its repossession of, and its subsequent refusal to return, the Rodeo violated a fundamental tenet of bankruptcy relief, but I do not accept that Easton should not be punished for its blatant obstinance in acknowledging Debtors' bankruptcy.

Judge Frank examined the difficulty of calculating, with any degree of precision, damages to be awarded for emotional distress suffered by the debtor when a creditor violated the discharge order. Meyers, 2006 WL 1560936, at *4 - 5. Similarly, it is difficult for me to quantify the amount to be meted against Easton and in favor of Debtors. I find that Easton's abject refusal to return the Rodeo even when it was fully aware of Debtors' bankruptcy must be sanctioned beyond simple reimbursement of the actual damages it caused. One of the long-standing justifications for any award of punitive damages is to alert the offenders, and just as importantly, the industry, to the serious nature of their actions. With the dual goals of punishment to Easton and deterrence in the industry, I will award against Easton and in favor of Debtors punitive damages in the amount of $1,840, $840 of which shall be "paid" by the expungement of all debt owed to Easton by Debtors and $1,000 of which shall be a cash payment.